**IN THE UNITED STATES COURT**
**EASTERN DIVISION OF ARKANSAS**

**RUSSELLVILLE SCHOOL DISTRICT**                                      **PLAINTIFF**

**V.**                                 **CASE NO. 4:20 cv-722**

**T. R., PARENT AND**                                      **DEFENDANT**
**NEXT FRIEND OF K.R.,  A MINOR**

### FIRST AMENDED COMPLAINT

Plaintiff, Russellville School District (RSD hereafter), by and through counsel, for its

Amended Complaint alleges and states the following:

### I. PARTIES, JURISDICTION AND VENUE

1.  This  Complaint seeks review of the findings and decision of the administrative

hearing officer in a due process hearing brought under the Individuals with Disabilities Education

Act ( the "IDEA), 20 U.S.C.1 §400 *et seq*., specifically pursuant to 20 U.S.C. 1415(i)(2) and

(3)(A).

2.  RSD is a public school district organized and operating pursuant to the laws of the

State of Arkansas.

3.  RSD is a party aggrieved by the Hearing Officer's Final Decision and

Order (the "Decision") in administrative Case No. H-20-09, before the Arkansas Department of

Education.

4.  Defendant T. Roper ("Parent") filed an IDEA Due Process Complaint ("Complaint")

with the Arkansas Department of Education initiating an IDEA Due Process Hearing

("Hearing"),  in her capacity as parent of her student, K.R., a minor ("Student").

5.  Both Parent and Student are individuals residing in RSD.

1

6.  This Court has subject matter jurisdiction over RSD's Complaint pursuant to 20 U.S.C. §1415(i)(2)(A) and (3)(A).

7.  Venue is proper in this Court pursuant to 29 U.S.C. §§139(b)(1),(2).

## II.  FACTUAL BACKGROUND

8.  At the time Parent filed her Complaint, September 23, 2019, Student was a six year old enrolled in RSD, and attending the kindergarten-second grade (K-2) alternative learning environment classroom located at Sequoyah Elementary School.  Student was identified as a child with a disability under the IDEA and classified as a student with an Other Health Impairment (OHI) under IDEA.

### PRESCHOOL

9.  As a five year old, the student was referred to RSD for kindergarten by Pediatrics Plus, a preschool and therapy provider. Ex. Vol. II, p.8.[1]

10.  Renee King, the District's special education supervisor completed the referral form on February 28, 2019 based on preschool occupational therapy, physical therapy and speech evaluations from Pediatrics Plus. Ex. Vol. II, 6. His diagnosis on the referral was listed as "Dev. [developmental]Delay, services for fine motor, sensory, and communication deficits."  Ex. Vol. II, 6. His strengths were listed as "he did not require physical therapy and exhibited average language skills." Ex. Vol. II, 6.

### TRANSITION CONFERENCE

11.  A referral conference to public school was held March 14, 2019.  Ex. Vol. II. p.22-

---

[1] References are to the administrative record, which will be provided when certified copy is received from the Arkansas Department of Education.

24.  Pediatrics  Plus provided a developmental evaluation (Ex. Vol. II, p. 85-90) they had recently completed and a past evaluation from the previous year from Dr. Kim Dielman, a psychologist, at this referral conference.  Ex.Vol. II, p.62-63.

12.  Dielman's report indicated diagnoses of Unspecified Disruptive Impulse and Control Disorder, which she noted included Oppositional Defiant and Conduct Disorders (Ex. Vol.II, 63) and noted he had characteristics of Attention Deficit Hyperactivity Disorder (ADHD) which should be assessed when he was older if, even with appropriate therapy, he continued to display impulsivity and hyperactivity.  Ex. Vol. II, 62-63.  Dr. Dielman  noted that he displayed characteristics of sensory processing disorder for which there was no medical code therefore she gave him a diagnosis of Unspecified Symptoms and Signs involving the Nervous System to account for his sensory issues. Ex. Vol. II, 62.  She specifically noted that the student did not meet criteria for Autism as he "can engage socially but chooses not to, his nonverbal communication is well modulated, he enjoys playing interactively with others he will take instruction and guidance from others and while his play is rough it is not atypical." Ex. Vol. II, p. 62.

13.  At the referral conference the team agreed additional testing was needed to determine his eligibility for school age special education services and supports. Ex. Vol. II, p. 13.  The parent signed consent for evaluation. Ex. Vol. II, p. 12.

14.  Renee King, RSD special education supervisor, reported that at this transition referral conference the Pediatrics Plus representative said he had had behavior problems but they were much improved at school; the parent reported he exhibited behavior issues at home such as kicking, hitting, throwing things; and his grandfather reported the student did not hit him which

the grandfather attributed to fact that he, the grandfather, disciplined him. King noted on the

Notice Of Conference that he had significant behavioral problems at school.  Ex. Vol. II, p. 13.

## EVALUATIONS

15.  Following the March 14, 2 019 conference, King collected records from Dr. Robin

Kirby, the student's primary care physician, (Ex. Vol. 81-83) from Arkansas Children's Hospital

for his audiological evaluation and swallow study, (Ex. Vol. II, 58:61) and from Dr. Van

Lanthum, his gastroenterologist. Ex. Vol. 81-83.  Dr. Kirby provided a Physical Assessment

dated 11/19/18 noting all body systems were within normal limits, as for development, she

indicated social and speech language skills within normal limits with fine and gross motor skill

ABNL (abnormal). Ex. Vol. II, p. 81-83.

16.  Pediatrics Plus included in their Developmental Evaluation Classroom Treatment

Plan, Objectives addressing home tasks and typical kindergarten skills. Ex. Vol. II, p. 88.

17.  RSD's occupational therapist, Amy Barley reviewed the May 21, 2018 Pediatrics

Plus occupational therapy evaluation.  She observed the student at Pediatrics Plus and visited

with the student's then current occupational therapist from Pediatrics Plus, Calvin Jones, who felt

the student would need occupational therapy at school.

18.  Barley conducted a clinical observation and administered the Beery Visual Motor

Integration test, (VMI). Ex. Vol. II, p.93-94.   The VMI is widely used by public schools to

determine the need for occupational therapy services in schools.

19.  The VMI showed his visual skills were within normal limits but his motor skills and

the integration of visual and motor skills were mildly delayed. His delay was 1.3 standard

deviations below the mean, which score was insufficient to qualify him for occupational therapy

services under the Medicaid standard.

20. Barley utilized the prior 2018 Pediatrics Plus evaluation and Jones' clinical assessment to find the student eligible for services and  recommended occupational therapy services sixty (60) minutes a week. Ex. Vol. II, p.93.

21. Barley developed eleven school related goals addressing sensory needs, handwriting, fine motor skills, visual skills and the integration of visual and motor skills. Ex. Vol. II, p. 94-95. She determined the amount of occupational therapy to be sixty minutes per week.

22. The District's Speech Therapist, Felicia Head, reviewed the Student's social history and reviewed available records including his June 6, 2018 speech evaluation from Pediatrics Plus. Ex. Vol. II, p.72-80 and 95-96. The Pediatrics Plus June 6, 2018 speech evaluation reported that he had tested out of speech in February, 2018 at his previous preschool, ABC. Ex. Vol. II, p. 73. However, this June, 2018 Pediatrics Plus evaluation showed articulation errors sufficient to qualify him for speech services for articulation, but only mild language impairment insufficient to warrant speech language services under Medicaid at Pediatrics Plus. Ex. Vol. II, 65-71.

23. Head administered two language assessments April 5, 2019, the Arizona Articulation Proficiency Scale, 3rd for articulation and the Oral and Written Language Scales 2nd for listening comprehension (receptive language) and oral expression (expressive language). Ex. Vol. II, 98-99. She also completed an oral peripheral examination, assessment of fluency and voice, behavioral observations and observations relevant to pragmatic language. Ex. Vol. II, 97-99.

24. Head's evaluations demonstrated age appropriate articulation, language skills within normal limits, average voice and fluency and adequate oral mechanism. Ex. Vol. II, 95-101. The student required tangible items to establish rapport and breaks with a toy to complete the tests.

Ex, Vol. II, p. 97.

25.  The District's School Psychologist, Dr. Kyla Warnick,  completed a School

Psychological Report dated May 3, 2019. Ex. Vol. II, 114-120.  She assessed the student with the

Wide Range Achievement Test 4 (WRAT) on which he scored in the borderline range for word

reading and in the deficit range on spelling. Ex. Vol. II, 116. Math computation was low average.

Ex. Vol. II, 116.

26.  Warnick attempted the Reynolds Intellectual Assessment Scales with the student but

abandoned this test when he did not respond appropriately to the practice items and directions.

Ex. Vol. II, 116. She switched to the Wechsler Nonverbal Scale of Ability, a nonverbal test. Ex.

Vol. II, 116. On this test his intelligence quotient was 81, in the low average range.  She noted

that the coding portion of this test was a timed test that called for sustained attention.  This was

the portion on which he scored the lowest. Ex. Vol. II, p. 114-116.

27.  The student's preschool teacher completed the Adaptive Behavior Evaluation Scale

(ABES) school version.  On this test the student scored in the low average range overall. Ex. Vol.

II, p.117.  His conceptual Domain quotient, consisting of communication skills and functional

academics, was in the average range.  Ex. Vol. II, p.117. His Social Domain, consisting of social,

leisure, and self direction was in the low average range. Ex. Vol. II, p.117.   His Practical

Domain, consisting of self care, health and safety, home living, work and community, was in the

low average domain. Ex. Vol. II, p.117. The student's preschool teacher also completed the

Classroom Based Assessment.  Ex. Vol. II, p 118-119. The student's adaptive behavior using the

ABES-R2 was in the low average range. Ex. Vol. II, p.120.

28.  Based on these assessments and his diagnosis from Dr. Dielman, health records and

other pieces of information gathered,  the school psychologist suggested he met the Other Health

Impairment category under IDEA eligibility categories based on his prior diagnoses of

Unspecified Disruptive Impulse Control and Conduct disorder, Unspecified Symptoms and Signs

Involving the Nervous System. Ex. Vol. II, p. 120.[2]

### EVALUATION CONFERENCE

29.  The RSD scheduled an evaluation conference for May 20, 2019. Ex. Vol. II, p. 16.

30.  Dr. Kyla Warnick  the School Psychologist who had evaluated him, Celia Wortham,

a kindergarten teacher, Luann Colling, a special education teacher, Leann Robinson, an

Occupational Therapist, Felicia Head, the Speech Therapist who had evaluated him, Vicki

Mistler, the school nurse, Brittany Turner the special education supervisor, and the parent

attended the conference.[3] Ex. Vol. II, p.21.

31.  At the conference RSD personnel presented the RSD evaluations. Ex. Vol. II, p.23-

25.   Leann Robinson, who would be the student's occupational therapist at his school, Dwight

Elementary,  presented Barley's occupational therapy evaluation.

32.  The speech evaluator, Head,  explained her evaluation and that his scores were

average and age appropriate. Ex. Vol. II p. 101. She pointed out in her evaluation that he was not

displaying his skills consistently in the classroom according to his preschool teacher and that he

should therefore be monitored.  Ex. Vol. II p. 100-101.

---

[2] Criteria for IDEA services for students under five, and services for school age students
five to twenty one, are different so that something more than "developmental delay" was needed
for school age eligibility under IDEA.

[3] Student's grandmother also attended the conference but did not sign the attendance
sheet.

33.  Dr. Kyla Warnick recommended he be identified under IDEA under the Other Health Impairment category.  Ex. Vol. II p. 120.

34.  Dr. Warnick made several recommendations for his Individualized Education Plan (IEP).  Ex. Vol. II, p. 120.

35.  The team settled on thirty minutes (30) a day special education for reading and thirty minutes (30) special education a day for writing. Most of Warnick's suggestions were added to IEP.  Ex. Vol. II, p. 36.

36.  The parent brought what she described as a behavior plan which she said she had put together from information she found on the internet. Ex. Vol. II, 42-22.

37.  The IEP added some items from the parent, including option to use a safe place, visual schedule, noise reduction headphones, and access to sensory items.  Ex. Vol. II, p. 28 -29.

38.  The team agreed to meet before school and talk about behavior. Ex. Vol. II, p. 24.

39.  The nurse and parent discussed his health care needs and added a plan to address his asthma and lactose intolerance. Ex. Vol. II, p. 29.

40. Following the May 20, 2019 IEP meeting the parent had the student evaluated for speech on May 31, 2019 by Pediatrics Plus. Ex. Vol. 153-170.  On June 4, 2019 the parent had the student evaluated for ADHD at Dennis Developmental Center. Ex. Vol. II,171-177. In August, the parent took the student to Dennis Development Center for an Autism evaluation. Ex. Vol. II, 178.  These evaluations were not shared with the District until much later.

## DWIGHT ELEMENTARY

41.  On August 7, 2019 teachers returned to school on their 2019-20 contracts.  Mrs. Colling contacted the parent for an IEP meeting which was scheduled for September 3, 2019.

8

Ex. Vol. II, 146.

42.  On August 9, 2019 the student's teachers signed off on his accommodations. Ex. Vol. II, p.31.

43.  The student began school on August 14, 2019.   On August 16, 2019 the parent signed a release of information for Arkansas Children's Hospital for an Autism evaluation.

44.  The signed release was faxed to Dennis development Center to obtain the evaluations and a partial evaluation was faxed back to the school. Ex. Vol. 2, 191 A-G.

45.  The student began having difficulties at school by the within a day or two.  He had repeated episodes of kicking, slapping and throwing things.  Ex. Vol. II, p. 128 -129.

46.  A notice of conference for the September 3, 2019 IEP meeting was mailed to the parent August 20, 2019.  Ex. Vol. II, p. 121.

47.  On August 20, the parent met with the principal and counselor concerned about a communication she had from the teacher which she felt did not show enough concern about her student.  At this meeting she, the principal and counselor discussed the difficulties the student was having in the classroom and agreed he might need a smaller environment. They discussed moving up the already scheduled September IEP meeting.  Ex. Vol. II, p. 147.

48.  On August 20, 2019 Renee King made a note that the parent called asking for the IEP meeting to be moved, saying the student had been diagnosed with Autism and she could best meet on Monday, Wednesday or Friday.  Ex. Vol. II, p. 148.  King texted the principal that they would meet Monday, Wednesday, or Friday the next week. Ex. Vol. II, p. 149.  The meeting was ultimately moved up to August 26, 2019. Ex. Vol. II, 124.

49.  On Friday, August 23, 2019  there was an incident in the kindergarten classroom. The

kindergarten teacher swatted the student on the leg, and yelled at him, in the classroom in front of other students.  This was without authorization and against school policy.   The kindergarten teacher was suspended and the parent was notified.

50.  The IEP team met as planned on Monday, August 26, 2019. Ex. Vol. II, 128.

51.  At the August 26, 2019 IEP team meeting the team reviewed new evaluations, adjusted his accommodations to include a list of behavioral supports,  determined to do additional speech testing including pragmatic language, determined to conduct a functional behavior assessment and refer him to the alternative learning classroom at Sequoyah.

52.  The team did not change the student's occupational therapy services but added a sensory diet to the IEP.  Ex. Vol. II, p. 135. The sensory diet included multiple activities for calming and organization, activities to perform before work activities, activities while performing work, and specific recommendations for the classroom. Ex. Vol. II, p. 135-136.

53.  The team went over the ADHD evaluation from Dennis Development Center and what they had of the Autism evaluation. The team determined not to change the student's disability category to Autism until they received the full Autism report from Dennis Development Center. Ex. Vol. VII, 128.

54.  At this August meeting the parent requested the student be taken out of Ms. Wortham's class and be placed in a smaller class. The parent had a list of options she wanted to discuss that included self contained classroom, one on one aide, speech therapy, and an functional behavioral assessment. The team discussed self-contained classroom and  a one-on-one aide, and the alternative learning classroom, because of its smaller size and behavioral focus.

55.  The IEP team agreed to conduct a functional behavioral assessment and to have a new speech evaluation. Ex. Vol. II, 128.

56. The team made a referral to the alternative learning environment, behavioral support classroom.

57.  he principal from Dwight completed an referral to the alternative learning classroom form. Ex. Vol. III, 220-221.  She and the parent met with Josh Edgin,the alternative learning director, Briget Smith the teachers of the alternative learning classroom, and the counselor from Sequoyah. Ex. Vol. III, 222.

58. Smith explained how the behavioral point system worked in the alternative learning environment classroom  . The point system was part of the Boys Town curriculum, a research based social skills program the school had adopted on the recommendation of the Department of Education. The time out system used with Boys Town includes a replacement behavior component.

59.  Sequoyah did not hold an IEP meeting as the student's special education services and special education placement did not change.   He saw the special education teacher McVey for his reading and writing special education services and continued his occupational therapy with Amy Barley, the occupational therapist at Sequoyah.

**THE ALTERNATIVE LEARNING ENVIRONMENT CLASSROOM**

60.  The alternative learning classroom is a general education classroom as opposed to a special education classroom.  At the time student enrolled it consisted of eight students, two of whom received special education. The classroom is a small very structured classroom with a teacher and two aides.

11

61.  It provided the same general education curriculum for academics as the grade level curriculums, but included a social skills curriculum and a token economy as well as small group instruction and breaks for behavior.

62.  The student was accepted and started in the alternative learning classroom September 4, 2019.  His first day of attendance he had an a behavioral episode and a resulting time out in the time out room. His mother was notified.

63.  On September 11, 2019 Kyla Warnick did her first observation for the Functional Behavioral Assessment. Ex. Vol. III, p. 336. The speech therapist, Jessica Wright saw him September 13, 2019 to administer the pragmatics portion of the Comprehensive Assessment of Spoken Language (CASL) and an observation for the new speech evaluation.  She also observed him September 20 and 25, 2019.  Ex. Vol. III, p. 337-339.

64.  The student had two[4] additional behavioral episodes for which resulted in a time out in the time out room before the hearing was filed.  Ex. Vol. III, 227, 235.

65.  There was a dramatic drop in the student's misbehavior after the move to the alternative learning environment classroom.

66.  On September 17, the parent learned the kindergarten teacher who had spatted the student was being returned to school.

67.  She confronted the superintendent and told him he had his chance to fix things but didn't. She posted her surreptitious recording of the conversation with him on her facebook page, Justice for K.

68.  On September 19, 2019 the parent called or spoke with Barbara McShane, the school

---

principal, and asked to meet Monday at 8:00 a.m. to see about changing the student's placement in the alternative learning environment classroom.

69.   The Parent asked McShane to have Brittany Turner, the special education teachers, at the meeting. Turner advised McShane if the parent wanted to change his placement it would need to be an IEP meeting.

70.   The team called the parent when she did not show up for the meeting but did not reach her. Ex. Vol II, 183. The team reviewed the student's progress and determined to send the parent the required fourteen day notice for another meeting. Ex. Vol II, 183.

71.   The parent filed for due process on September 23, 2019.

72.  On September 25, 2019 the parent withdrew her consent so no further testing was completed on the functional behavior assessment or the speech evaluation. Ex. Vol. III, p.179.

## THE DUE PROCESS HEARING COMPLAINT AND HEARING

73.   The parent filed for due process on September 23, 2019. ( See generally, Due Process Complaint, a copy of which is attached hereto as Exhibit A).

74.   The Due Process Complaint alleges the RSD violated procedural and substantive requirements of the IDEA and failed to provide the student a Free Appropriate Public Education ("FAPE").

75.   The hearing officer heard testimony on November 19, 20, and 21, December 12, 13, 2019, and additionally on January 9, 28 and March 8, 2020.   On March 10, 2020 a hearing decision was rendered by the hearing officer.

76.   In her Decision the hearing officer set forth the issue as whether the student had been denied FAPE in violation of procedural and substantive requirements of the IDEA by 1)

failing to conduct an appropriate speech evaluation for Student 2) failing to consider outside evaluations provided by the parent; 3) failing to afford the parent meaningful participation in Student's education and 4) failing to provide individualized educational programs reasonably calculated to provide educational benefit in that they failed to properly address Student's ongoing behavior issues, provide for a functional behavior assessment, and include a behavior intervention plan.

77.   The hearing officer found for RSD on issues 1, 2, and 3. In relation to item 4 the hearing officer found that the two IEP's developed May 20, 2019 and August 26, 2019 were inappropriate in that they included no behavioral intervention plan (BIP) or behavioral supports for Student, and denied the student FAPE between March 14, 2019 and September 23, 2019. Decision pp. 37, and 40.

78.   The Decision ordered RSD to contact a Board Certified Behavior Analyst ( BCBA) within fifteen days and make arrangements for a full behavioral evaluation, a program to address behavioral issues going forward; provide ADA therapy should the BCBA recommend it; revise the student's IEP to reflect a change in the student's placement from alternative learning environment  classroom to a classroom appropriate in light of Student's circumstances; IEP to meet and discuss whether that placement should be traditional general education classroom with supports or a self contained classroom; agree to a transition plan and meet every three months to review the new placement to determine if it is appropriate; assign a one to one paraprofessional to the student. Decision, p. 40-41.

## CLAIM FOR RELIEF UNDER IDEA

79. The RSD re-alleges and restates each of the allegations contained in the preceding

paragraphs as if set forth fully herein.

80.   The hearing officer found the student's IEP's developed in May, 2019 and revised August 26, 2019, were insufficient because they did not sufficiently address the student's behavior.

81.   The student's IEP developed on May 20, 2019 was calculated to provide appropriate education based upon information available to the District at the time and with appropriate deference to least restrictive environment requirements.

82.   An IEP must be judged based on the information available at the time is was written. It would be improper to judge an IEP in hindsight. See  *K.E. v. Independent Sch. Dist.*, 647 F.3d 795 (8th Cir. 2011).  See also *Roland M. v. Concord Sch. Comm*., 910 F.2d 983, 992 (1st Cir.1990), cert. denied, 499 U.S. 912, 111 S. Ct. 1122, 113 L. Ed. 2d 230 (1991) "An IEP is a snapshot, not a retrospective," and we must "take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *Roland M*., 910 F.2d at 992.

83.   In judging the student's IEP developed in March, 2019  the hearing officer failed to take into account what information was available at the time upon which to base decisions about the IEP.

84.   The Parent presented no information and the evaluations deduced none to show what specific disability related behaviors were present in the preschool setting at the time of the May IEP that should have been addressed in a <u>prospective</u> IEP. Deilman's Evaluation from the previous March, a year earlier, indicated the student had history of aggression towards peers and adults, does not like to share, prefers to play alone, is easily frustrated, has sensory issues with

noise and textures, overreacts if he gets dirty, and has a need for sensory input which he gets from hitting, throwing chairs and kicking things. Ex. Vol. II, p 62.

85.   There was no information from his then current placement at Pediatrics Plus saying he still had these behaviors near the time of the meeting and he came to RSD with no behavior plan.

86.   Information from the referral conference indicated that he had previously had behavior issues (those behaviors were not identified) but that behavior at school had improved.

87.   The February, 2019 developmental evaluation from Pediatrics Plus, strengths and weaknesses section indicated his needs as following adult directions, following classroom rules, waiting for teacher attention, and resolve conflicts without aggression. These are all typical skills taught in kindergarten.  Information in the evaluations from Pediatrics Plus did not identify any specific current behaviors that needed to be addressed.

88.   Three RSD evaluators observed the student at Pediatrics Plus and spent time one on one with him in the evaluations in the days before the conference. They reported no significant behavior problems.

89.   His adaptive behavior scores on the Adaptive Behavior Scales (School Version Revised) completed by his preschool teacher showed nothing of significance. Ex. Vol. II, 117.

90.   The Curriculum Classroom Assessment  demonstrated no significant behavioral concerns. Ex. Vol. II, p. 118.

91.   The only significant behavior information came from his parent who reported on her social history and in the conference that he was quick to anger, has meltdowns including hitting, yelling, throwing and breaking things. However, her reports were historical and did not indicate

that he still had those behaviors currently in his preschool setting but only that she was concerned about how he might behave in kindergarten.

92.  The hearing officer failed to distinguish between what the District knew about the student's behavior at the time of the IEP meeting in May, 2019, from historical information developed at the hearing and behavioral information once he began school.

93.  The IEP developed in May, 2019 included as accommodations sensory tools/supports addressing sensory needs, option to use a safe place addressing anger and frustration, noise reduction headphones addressing issues with noise, and access to sensory items again addressing sensory needs. It also included a prefilled schedule, visual schedule, preferential seating, frequent feedback opportunities for breaks, and transition warnings. These were all behavioral supports.

94.  His occupational therapy goals included three goals aimed at improving  modulation including gross motor tasks, walking with weighted backpack, and sensory tools for use in the classroom.  Again these were all aimed at providing him supports he needed to modulate his sensory input and calm himself, thereby addressing behavior.

95.  Additionally the hearing officer found a denial of FAPE for a period of time the District owed the student no educational services as school did not begin until August 2019.

96.  The hearing officer erroneously found RSD held a meeting without the  parent on August 9, 2019 to discuss an evaluation from Dennis Development Center in direct contravention of first hand testimony of witnesses who were allegedly at the meeting.

97.  The hearing officer failed to recognize the parent's request for a smaller classroom as part of the decision to refer the student to the alternative learning environment  classroom instead

17

speculating on ways the school could have avoided the smaller classroom.

98.  In judging the August 26, 2019 IEP the hearing officer failed to take into account behavioral supports added to the IEP and the IEP team's decision to conduct a functional behavioral assessment to provide direction regarding his behavior.

99.  A functional behavioral assessment (FBA) and a behavior intervention plan (BIP) are in certain circumstances required by IDEA.   Those circumstances did not exist in this case.  The hearing officer's determination that the IEP's were inadequate because they did not include a BIP are in error.

100.  The hearing officer found the RSD should have had an emergency meeting to obtain consent for an FBA failing to recognize that is essentially what the RSD had done, moving up a meeting already set September 4, 2019 to August 26, 2019.

101.  The hearing officer found the RSD did not complete the FBA quick enough yet the RSD was completing it consistent with the Arkansas Department of Education regulations.

102.  The hearing officer also failed to recognize the behavioral support nature of the alternative learning classroom to which the student was referred and admitted.

103.  Rather than requiring the Parent to bear the burden of proving by a preponderance of the evidence that the IEPs were not designed to provide FAPE the hearing officer had to speculate that had certain actions been taken earlier the student might have been able to remain in his kindergarten classroom.

104.  The hearing officer made no distinction between the IEP developed in March 2019 and one developed in August 2019.

105.  The hearing officer failed to consider that the student here made appropriate

educational progress in light of his circumstances in both academic and behavioral areas demonstrating that his IEP was sufficient for the student to make educational progress as required by the IDEA.   Therefore his IEP's were not inappropriate.

106.  The hearing officer did not find the student's placement in the alternative learning environment classroom to be inappropriate or in any way a violation of IDEA, yet ordered a change in placement to one of two placements on opposite ends of the continuum of educational placements.  Her decision provides no rationale for any change of educational placement under IDEA, let alone a change to the most restrictive placement or alternatively to the opposite end of the spectrum, regular class, the same placement on the continuum as the alternative learning environment classroom.

107. The Decision fails to recognize that referral to the alternative learning environment classroom was in fact a consideration of and  response to the student's behavioral issues and provided behavioral interventions and supports and other strategies to address the student's behavior.

108.  The hearing officer fails to place the burden of proof on the parent to show that adding anything to the IEP would have resulted in any improvement in the student's behavior or upon the parent to show that what the school did in response to his behavior was not effective.

109. The hearing officer fails to recognize the role that a smaller environment played in the student's improved behavior.

110.  The hearing officer failed to recognize that any failure to include on an IEP , behavioral services the child received as part of the alternative learning environment classroom, is at most a procedural violation that did not result in any loss to the child constituting a denial of

FAPE.

111.  The hearing officer found a denial of FAPE for a period of time the District owed

the student no educational services as school did not begin until August 2019.

112.  The hearing officer erroneously found RSD held a meeting without the

 parent on August 9, 2019 to discuss an evaluation from Dennis Development Center in direct

contravention of first hand testimony of witnesses who were allegedly at the meeting. In fact, the

teachers signed off on his accommodations on August 9, 2019 and with the first signer

incorrectly stating why they had accessed his records on the access sheet and the others using

ditto marks repeating the error.

113.  The student's IEP's were adequate for him to make reasonable progress in light of

his circumstances in contravention of the hearing officer's assertion that the was no evidence of

his  progress.

114.  This decision, even if the District complies with the hearing officer's order is not

moot as parent seeks substantial attorneys fees as a prevailing party in the due process hearing if

the decision stands.

WHEREFORE, the RSD requests this Court reverse the hearing officer's decision and

enter a finding for the District, and for all other appropriate relief.

<div style="margin-left:40%">

Respectfully submitted,

Sharon Carden Streett, ABA No. 81150
P.O. Box 250418
Little Rock, AR 72225-0418
Tel. (501) 666-6066
Email: scstreett@comcast.net
sharon@StreettLawOffices.com

David M. Fuqua, ABA No. 80048

</div>

dfuqua@fc-lawyers.com
Fuqua Campbell, P.A.
3500 Cantrell Road
Little Rock, Arkansas 72202
(501) 374-0200
 Email: dfuqua@fc-lawyers.com


By:   _____
        Sharon Carden Streett


**Certificate of Service**

I hereby certify that on September 25, 2020, I electronically filed the foregoing with the Clerk of the United States District Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_____
 Sharon Carden Streett

21